```
 1   UNITED STATES DISTRICT COURT
     EASTERN DISTRICT OF NEW YORK
 2   -----------------------------x
                                      18-CR-457(AMD)
 3   UNITED STATES OF AMERICA,
                                      United States Courthouse
 4                                    Brooklyn, New York

 5        -against-                   July 23, 2020
                                      2:30 p.m.
 6   HUAWEI TECHNOLOGIES CO.,
     LTD,
 7        Defendants.
     -----------------------------x
 8        TRANSCRIPT OF CRIMINAL CAUSE FOR STATUS CONFERENCE
              BEFORE THE HONORABLE ANN DONNELLY
 9               UNITED STATES DISTRICT JUDGE
                   TELEPHONIC PROCEEDING
10
     APPEARANCES
11   For the Government:      UNITED STATES ATTORNEY'S OFFICE
                              Eastern District of New York
12                            271 Cadman Plaza East
                              Brooklyn, New York 11201
13                            BY:  ALEXANDER SOLOMON, ESQ.
                                   DAVID KESSLER, ESQ.
14                                      JULIA NESTOR, ESQ.
                                   SARAH EVANS, ESQ.
15
                              DEPARTMENT OF JUSTICE
16                            BY:  DAVID LIM, ESQ.
                                   THEA KENDLER, ESQ.
17                                 CHRISTIAN NAUVEL, ESQ.
                                   LAURA BILLINGS, ESQ.
18
                              NATHAN REILLY, ESQ.
19                            CRAIG HEREEN, ESQ.
                              Assistant United States Attorneys
20
     Also Present:                    HARRY RUCKER
21
     For the Defendants:      SIDLEY AUSTIN, LLP
22                            787 Seventh Avenue
                              New York, New York 10019
23                            BY:  THOMAS C. GREEN, ESQ.
                                   MICHAEL LEVY, ESQ.
24                                 JOAN LOUGHNANE, ESQ.
                                   CAITLIN MATHENY, ESQ.
25   (Continued next page.)
```

Rivka Teich CSR, RPR, RMR    , FCRR
Official Court Reporter

```
 1   (Appearances Continued.)

 2
     For the Defendants:      JENNER & BLOCK LLP
 3                            1099 New York Avenue NW
                              District of Columbia, DC 20001
 4                            BY:  DAVID BITKOWER, ESQ.
                                       MATTHEW HELLMAN, ESQ.
 5

 6
     Court Reporter:          Rivka Teich, CSR, RPR, RMR, FCRR
 7                            Phone:  718-613-2268
                              Email:  RivkaTeich@gmail.com
 8
     Proceedings recorded by mechanical stenography.  Transcript
 9   produced by computer-aided transcription.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

*Rivka Teich CSR, RPR, RMR FCRR*
*Official Court Reporter*

STATUS CONFERENCE

1              (Telephonic conference.)

2              THE COURTROOM DEPUTY:  All Rise.  This is criminal

3    cause for a telephone status conference 18-CR-457, U.S. versus

4    Huawei Tech et al.

5              Before asking the parties to state their appearances

6    I would like to note the following:  Persons granted remote

7    access to proceedings are reminded of the general prohibition

8    against photographing, recording, and rebroadcasting of court

9    proceedings.  Violation of these prohibitions may result in

10   sanctions, including removal of court issued media

11   credentials, restricted entry to future hearings, denial of

12   entry to future hearings, or any other sanctions deemed

13   necessary by the Court.

14             Counsel, state your appearance Government first.

15             MR. SOLOMON:  Good afternoon, your Honor, Alex

16   Solomon for the Government.  With us for the prosecution team

17   are Julia Nestor, David Kessler, Sarah Evans, Laura Billings,

18   Christian Nauvel, Thea Kendler and David Lim.  There are two

19   firewall attorneys for the Government on the line, Nathan

20   Reilly and Craig Hereen.  Also Harry Rucker is present as

21   well.

22             THE COURT:  Okay.  Good afternoon.

23             MR. GREEN:  Good afternoon, your Honor, this is Tom

24   Green from Sidley Austin representing the Huawei entities

25   along with my colleagues Joan Loughnane, Michael Levy and

STATUS CONFERENCE

1    Caitlin Matheny.

2            THE COURT:  Good afternoon.

3            MR. BITKOWER:  For Jenner & Block, David Bitkower

4    and Matthew Hellman appearing for the defendants.  And there

5    are some associates and others in what we'll call the gallery,

6    but I think it will be just us speaking.

7            THE COURT:  Good afternoon.  We have a few things to

8    accomplish here today I'm going to try to streamline this a

9    little bit.

10           The first application was by the defense to exclude

11   the public from a portion of today's proceeding.  Because of

12   the way I'm going to handle that particular aspect of it, I

13   find that that is not necessary because of the way I plan to

14   address that particular issue, which was not going to require

15   a conversation about particular items of discovery.  So I have

16   more to say about that in a minute, but I don't think that is

17   going to be necessary.

18           If some unpredictable thing happens, there is some

19   urgent need to do part of it off the record, we can do that

20   but I don't think that's going to happen.

21           I want to say a few things generally about the last

22   couple of months.  There has been a pretty steady stream of

23   submissions.  I have read them all.  But just as a general

24   matter, I say this having tried a couple of cases in my day

25   myself, I'm sympathetic of people's senses of urgency.  I want

STATUS CONFERENCE

1    to remind everybody that not every fact deserves your outrage.

2            It seems as though we are taking some things to 11

3    and complicating what is already a very complicated case

4    unnecessarily.  So I just want to say that generally.  I'd

5    like to take the temperature down a little bit.

6            So I'm going to address some of these things in no

7    particular order.  One of the disputes centers around how

8    discovery material is going to be handled.  And the parties to

9    their credit, and I appreciate it, entered into an agreement

10   about a protective order as to how the sensitive discovery

11   material is to be handled.  I don't think anybody is saying

12   that there shouldn't be a protective order.  The Government

13   has turned over, although there has been some dispute about

14   how much of the materials are have been designated sensitive

15   discovery material, but whatever the amount is, the dispute

16   centers around whether it's really sensitive discovery

17   material.  And a feature of this part of the argument is that

18   the defense doesn't want the prosecutors who designated it

19   sensitive discovery material, to know which documents

20   shouldn't be designated sensitive discovery material.  Instead

21   what the defense wants me to order is that a separate group of

22   prosecutors who did not designate the material go through

23   whatever pile of materials we're talking about and litigate

24   this issue.

25            And I've reviewed the submissions including the

STATUS CONFERENCE

1    unredacted version of what the defense submitted, and under

2    the circumstances I'm denying that application.  That would

3    add a layer of complication and really a waste of time to have

4    an entirely new group of prosecutors reviewing this material.

5            As I say, I have read all of the submissions, but I

6    don't agree that what the defense has submitted in terms of

7    the reasons why they want another group of prosecutors to look

8    at it warrants that kind of unnecessary complication.  So I'm

9    denying that application.

10           But the bottom line for this discovery question is,

11   that I'm sending you all back to the drawing board.  Because

12   even in the submissions that you have made it looks as though

13   the landscape on this changes, that there are things that you

14   can agree on.  And so I'm going to direct both sides to go

15   back and put your heads together and see if you can come up

16   with an agreement to at least some of this material.

17           Now, that's going to require the Government to look

18   at the materials that you designated as sensitive and

19   determine the extent to which there is a reasonable

20   alternative whether those materials can be redacted, to take

21   out the material that you're worried about without changing

22   the nature of what the document is.

23           All of this is to say that this is not a denial of

24   discovery.  The parties reached an agreement about how these

25   things would be addressed, part of the difficulty is and it's

STATUS CONFERENCE

1    beyond any of our control, is the pandemic that keeps people

2    from traveling.  And I believe, although I haven't kept up on

3    this, but I believe that people from the United States are not

4    permitted to travel into certain countries at this point.  So

5    that's a complication that is not anybody's fault.  But to the

6    extent that you can engage in a work-around of that, if you

7    can figure out if there is some other way -- we're doing this

8    hearing by phone -- if there is some other way that you can

9    make some accommodation, I'm going to encourage you to do

10   that.

11          The other thing I'm going to do is I'm going to

12   refer disputes about specific designations to the Magistrate

13   Judge.  Currently it's Judge Orenstein, but he's going to be

14   leaving us, so it might make sense to have somebody else

15   designated.  That is what we're going to do about this

16   question of sensitive discovery material.

17          I know that the defense says that there is no way

18   they can reach an accommodation.  I'm going to ask you to give

19   it a shot so we can move these things along.  That's what I

20   have to say about that matter.  I'm going to encourage the

21   lawyers to do that.  Okay?

22          Is there anything that somebody wants to say about

23   that?  I'm sure there is.

24          MR. BITKOWER:  I'll take up that.

25          Number one, I appreciate the Court's comments

*Rivka Teich CSR, RPR, RMR FCRR*
*Official Court Reporter*

STATUS CONFERENCE

1  obviously about not overstating things.  We are, in our

2  prospective obviously, trying not to do that.  Our clients are

3  charged with federal criminal offenses and it is higher than

4  11 for them to understand and see the evidence to prepare

5  their defenses.  We will take to heart, obviously what the

6  Court has said about trying to work it out, but just two

7  points I want to make here.

8          One is we would very much appreciate in the referral

9  orders to the Magistrate if the Court can put some kind of

10 time frame on this.  And just by way of example, the Court saw

11 just two days ago the Government exceeded to a D designation

12 of certain materials that included e-mails that were sent to

13 or from Huawei companies themselves that were designated as

14 sensitive in the first instance.  These are the company's own

15 documents that were designated as sensitive.

16         THE COURT:  I'm going to interrupt you for a second.

17 I want you to take yes for an answer, okay.

18         If they have D designated it, I'll consider a

19 reasonable time frame.  Although keep many mind, that the

20 request to have firewall counsel litigate this I think would

21 have stretched this out quite a bit longer.  So what kind of a

22 time frame do you have in mind?

23         MR. BITKOWER:  I would propose that if we make the

24 documents that is the subject of the motion available to the

25 prosecution team, then they should be able to respond within a

STATUS CONFERENCE

1  matter of two weeks.

2          THE COURT:  Mr. Solomon, what do you think about

3  that?

4          Let me also get a little clarity here.  There are

5  different numbers thrown around about how much we are talking

6  about, how much material.  I think I saw 21,000 pages as one

7  of the numbers.  I apologize if I confused something in the

8  rain storm of papers that I reviewed.  What actual numbers are

9  we talking about?

10          MR. BITKOWER:  You're not confused, it's 21,000

11  documents.  It's about 5 percent or a little less than

12  5 percent of the discovery at issue in this question.

13          THE COURT:  I'm sorry who is speaking?

14          MR. BITKOWER:  This is Mr. Bitkower.

15          THE COURT:  I forgot to give my speech to have mercy

16  on the court reporter, anyone who is speaking please identify

17  yourself before.  And everybody please make sure you don't

18  speak too quickly.

19          You said 21,000 pages?

20          MR. BITKOWER:  Documents.

21          THE COURT:  Mr. Solomon, what do you have to say

22  about this?

23          MR. SOLOMON:  Thank you, your Honor.  I think two

24  weeks is a little bit too aggressive.  This is not 21,000

25  pages, it's 21,000 documents, many of which are multiple

STATUS CONFERENCE

1   pages.  This is going to take us a fair bit of time.  We do

2   have limited resources on the team.

3          If we could ask for the Court's indulgence of six

4   weeks, I think that is ideal.  I was just informed it's

5   150,000 pages.  To truly master the pages, and your Honor has

6   suggested for example redactions, redacting 150,000 pages is a

7   significant endeavor.  So I think six weeks is what we would

8   ask for.

9          THE COURT:  I do think given the amount of material

10  that we're talking about, two weeks not entirely reasonable; I

11  think six weeks is.

12         But I think a lot can happen in that period of time.

13  My question is, do you have to review everything to come to

14  agreement about some things?  Whoever wants to answer that can

15  answer it.  Julia necessary enter.

16         MS. NESTOR:  I do think that we can probably work in

17  categories to the extent defense counsel engages on that.  So

18  I think we could work in categories, we will try to do so,

19  your Honor.  I don't want to commit to that before speaking to

20  defense counsel after the conference.  But we will try our

21  very best to do that.

22         THE COURT:  To work in categories.

23         MS. NESTOR:  Yes, your Honor.  The only concern I

24  have, even if we're work in categories there is still

25  redactions to be made.  That's a lengthy process and

STATUS CONFERENCE

1  production will take time.  Six weeks is reasonable, to the

2  extent we're having difficulties complying in that time we'll

3  let the Court know.

4           MR. BITKOWER:  I just wanted to say, I recognize

5  that they want to go over these materials over a six-week

6  period, that perhaps they won't get to the bottom of the pile

7  in the six-week period.  I ask that production and conference

8  be rolling and that materials be suggested to defense counsel

9  and be brought to the Magistrate before that period as they

10  are ready, that we not have a six-week delay before we begin

11  that process.

12           THE COURT:  Well, I mean, this is why I'm going to

13  trust you all to work this out.  I don't want to be involved

14  with minutia of when you're going to get what.  What I do want

15  you to do is -- I'm not suggesting that you haven't worked

16  well together on other issues.  But what is somewhat

17  frustrating for me is we get to these conferences then I

18  hear -- I spent all this time, which I enjoyed every single

19  part of reading what you submit -- then I find out that you

20  actually can budge on something.  I really expect and I'm

21  confident that you can come to some agreements on this without

22  involving the Court.  I'm here for that.  I'm not saying you

23  can't ever, but I really think a lot of this stuff can be done

24  without me and without the Magistrate Judge.  My hope is that

25  the Magistrate Judge will be there to resolve problems that

STATUS CONFERENCE

1    you can't truly workout.

2              It makes sense to me if you can turnover something

3    during the course of the six weeks, that's a good idea.  I

4    don't know why you wouldn't be able to do that, but it seems

5    like a good plan to me.  I think I didn't hear marching

6    orders.  Is there anything anybody else wanted to add?

7              MR. GREEN:  I would like to add that in the letter

8    we sent to, your Honor --

9              THE COURT:  Which one.

10             MR. GREEN:  Monday of this week.

11             I guess we say we tried to set forth a number of,

12   for lack of a better word, log jams that we're having over the

13   progress in the case.  I wanted to just make mention of our

14   request of the Government, which have been rather incessant

15   for particulars to help us better understand the Indictment

16   and prepare our defense.  We have not together, the Government

17   and defense, traveled very far down that road despite our

18   making every effort to convince the Government that there is

19   information which they both should disclose to us and which

20   they could disclose to us to avoid further controversy.

21             I'm wondering if there is some mechanism, we now

22   have a motion pending which was filed recently, no response

23   yet.  But I'm wondering whether there is some kind of similar

24   mechanism that you might admonish us to pursue to see if we

25   could together work that through as well and perhaps bring

STATUS CONFERENCE

1    those --

2            THE COURT:  The reason why I love the federal rules

3    of criminal procedure is because they tell you exactly what

4    you should be doing.  I think that in Judge Chin's opinion

5    U.S. against Chalmers he gives a pretty good road map in a

6    somewhat similar case regarding bills of particulars,

7    regarding disclosure of statements by corporate employees and

8    agents.

9            And I don't think I've got to remind anyone of the

10   obligations pursuant to Brady against Maryland.  So I haven't

11   heard what the Government's position is on this in terms of, I

12   know there has been a substantial amount of discovery provided

13   but in the Chalmers case, I think that's the case, Judge Chin

14   noted that one of the things that the Government did was

15   provide categories of evidence which led Judge Chin to the

16   conclusion that a Bill of Particulars was unnecessary.  And

17   that seems like something that makes sense in this case.

18           With respect to the Brady obligation, a lot of times

19   Brady doesn't become apparent until the Government knows what

20   the defense's position is.  I'm not telling you all anything

21   that you don't know.

22           I know from the letters that you made requests of

23   particular things that you think should be Brady.  There are

24   pretty bad penalties for prosecutors that don't follow their

25   Brady obligations.  So I don't think with lawyers of this

14

STATUS CONFERENCE

1   quality on both sides that it is necessary for me to referee

2   every discovery dispute, and it's not for the Magistrate

3   either.

4           And so I really am curious to hear from the

5   Government, though, what your response is.  And I mean, I

6   don't mean all the things in the letter, I just mean the

7   question of Brady.  I think there was a question about the

8   statements of corporate employees under Rule 16(a)(1)(C) and

9   whatever else was requested.

10          So where are we with that, Mr. Solomon, if you're in

11  a position to answer that?

12          MR. SOLOMON:  Thank you, your Honor.  I guess to

13  begin, we decided not to respond to the defense's letter from

14  Monday because we thought many of the issues were not ripe

15  yet.

16          With respect to statements by corporate defendants

17  we had a call last week with Huawei counsel and they indicated

18  their view on the law.  We agreed to do a follow up

19  conversation.  And before that conversation could take place

20  they moved for certain discovery in their latest motion to the

21  Court.

22          So I think our view is that we'd like to resume

23  conversations as a result of conversations with defense

24  counsel to identify a couple of items that we think we may

25  have overlooked earlier but we will turnover now.  It's a

STATUS CONFERENCE

1    small quantity of materials, but I think the conversation was

2    helpful.

3              I'm hopeful a future conversation will be similarly

4    helpful.

5              With respect to the Brady obligations.  Obviously

6    we're aware of the Brady obligations.  We understand the

7    theory of the defense insofar as to articulate to the extent

8    there were any victim financial institution employees who were

9    aware of the fraud and to not communicate that fraud to their

10   superiors, potential Brady information.  We are aware of that

11   view of that potential legal defense.  We don't agree it's a

12   viable defense but we'll look through materials and provide

13   them with materials that are potentially discoverable under

14   that theory.

15             And with respect to Bill of Particulars, they did

16   file a motion.  Given our August vacation schedules and also

17   our busy task of sorting through the SDM materials can I

18   propose a response date sometime in September for that?

19             THE COURT:  I think that's reasonable.  You don't

20   have any objection to that, do you, Mr. Green?

21             MR. GREEN:  Not really, your Honor.

22             THE COURT:  Okay --

23             MR. GREEN:  But if I may, if you would allow me to

24   add one word.  One of the problems we were trying to convey in

25   that letter --

*Rivka Teich CSR, RPR, RMR FCRR*
*Official Court Reporter*

16

STATUS CONFERENCE

1          THE COURT:  You're mad.

2          MR. GREEN:  No, no, no.  Despite the conversations

3    that we have with the Government and the exchange of the

4    letters, nothing much seems to get accomplished between the

5    two sides here.

6          Let me focus on Brady for a second.  In February we

7    sent a letter to the Government where we, in quite elaborate

8    detail, set out more than Mr. Solomon just referred to as

9    information that we deemed to be Brady material.  In essence

10   it said, without regard to whether you agree or disagree just

11   tell us whether you have it.  We don't want to fight with you

12   over documents and material that you don't have.  Just do us

13   the favor of telling us whether you have this material.  Of

14   course we got no response to that.

15         I think we've walked the road of compromise well.  I

16   think we've done what you would expect to us do.  And we'll do

17   everything that you now asked us to do.

18         We'll reengage with the Government.  We will sit

19   down, roll up our sleeves, and see if we can make some

20   progress.  I'd like to be optimistic.  I'll say this, I'll

21   stay optimistic for a while.

22         THE COURT:  I think that's good.

23         MR. GREEN:  I can't guarantee that we won't be back

24   to seek your assistance.

25         THE COURT:  I'm always happy to see you.  But

*Rivka Teich CSR, RPR, RMR FCRR*
*Official Court Reporter*

STATUS CONFERENCE

1    determining what is discoverable and not discoverable amongst

2    potentially countless pages of discovery is really something

3    the Government and you are going to have to work out.

4              As I say, if there are reasonable disputes one of

5    our fantastic Magistrate Judges will be available to do that.

6    I'm going to stay optimistic on that.

7              What September date did you give me for responding

8    to that motion, Mr. Solomon?

9              MR. SOLOMON:  Could we ask for September 14, please?

10             THE COURT:  Okay.  And then something tells me

11   you'll want to reply to that, Mr. Green.  How much time?

12             MR. GREEN:  I would say 20 days or so.

13             THE COURT:  Where does that take us Donna,

14   October 5?

15             COURTROOM DEPUTY:  Yes, October 5.

16             THE COURT:  Okay.  So October 5 will be the reply.

17             Now, I'm just going through my list here.  The other

18   thing I have a few questions about is the issue of sharing

19   things with Ms. Meng.  There is in the protective order a

20   carve-out already, which is an agreement that you'll negotiate

21   a separate agreement of disclosure to Ms. Meng.  And I think

22   recently there was an agreement that you could share material

23   that Ms. Meng had sent or received.  Do I have that right?

24             MR. GREEN:  May I ask Ms. Loughnane to reply?

25             MS. LOUGHNANE:  This is Joan Loughnane.  That's

*Rivka Teich CSR, RPR, RMR FCRR*
*Official Court Reporter*

STATUS CONFERENCE

1   right.  There is a supplemental protective order.  It permits

2   the sharing only of documents that Ms. Meng was originally on,

3   sent, received, copied on.

4            THE COURT:  Okay, so what I want to do is get a

5   little bit of a, make sure we're all on the same page of a few

6   things.  Do you agree that she is a fugitive from justice who

7   is not entitled to criminal discovery in her own right?

8            MS. LOUGHNANE:  I think she's contesting extradition

9   and under Second Circuit law constructively she's treated as a

10  fugitive.

11           THE COURT:  That's right.  The only thing I would

12  try to understand here is that, you're not trying to vindicate

13  her rights.  Your application is based on your right to

14  prepare a defense; is that right?

15           MS. LOUGHNANE:  That's exactly right.

16           THE COURT:  The other thing that I wanted to figure

17  out here is that, has she agreed to sit down with you and meet

18  with you?

19           MS. LOUGHNANE:  Your Honor, I don't know that that

20  question has been asked directly because we're not permitted

21  to discuss the issues that are on the table.

22           THE COURT:  Do you mean, would she discuss issues

23  with Huawei if that was permitted under the protective orders?

24  It's hard for me -- but under the current circumstances she's

25  a co-defendant.  So if she were here -- that's another way to

STATUS CONFERENCE

1    look at it -- if she were here obviously the co-defendants

2    could speak with her.  Is that right, Mr. Solomon?

3              MR. SOLOMON:  Mr. Kessler will be addressing this

4    argument.

5              MR. KESSLER:  This is David Kessler.  Yes, that's

6    correct.  Under the terms of the main protective order.

7              THE COURT:  Does everybody agree that it's not

8    permissible, it wouldn't be a permissible use of discovery to

9    assist Ms. Meng in fighting extradition?  Do both sides agree

10   with that?

11             MS. LOUGHNANE:  We have offered in the application

12   that we made in the conversations that we had with the

13   Government, that the conditions under which we would like to

14   show her documents would forbid her use of the documents in

15   the extradition proceedings.

16             THE COURT:  How is that?

17             MS. LOUGHNANE:  It's part of the conditions we

18   already agreed to.

19             THE COURT:  But it sounds to me, at least from what

20   the Government submitted and you all know the better than I

21   do, it sounds to me like she envisions using them, using

22   something any way in an effort to fight the extradition

23   proceeding.  Am I wrong?

24             MS. LOUGHNANE:  I think you're accurately describing

25   the Government's response.  But I think your confusion is

*Rivka Teich CSR, RPR, RMR FCRR*
*Official Court Reporter*

STATUS CONFERENCE

1   understandable because it's our confusion too.  The problem --

2            THE COURT:  I'm not confused I read -- I don't think

3   I'm confused about this.  Because they submitted something

4   that it was her position that materials in the criminal case,

5   that she was going to rely on them in her effort to resist

6   extradition.

7            MS. LOUGHNANE:  Right.  And confused is maybe not

8   the right word.

9            What I'm trying to say is that's what the Government

10  has said, and we don't think that that's anything that the

11  Court needs to be concerned about.  Because we have offered to

12  show her documents under a series of restrictions that would

13  prevent that problem from happening.

14           She will not be permitted to keep the documents; she

15  won't get a copy of the documents; she won't have them.  Her

16  Canadian counsel won't see them.  Her U.S. counsel won't keep

17  the documents.  And the protective order would forbid the use

18  of those documents in the extradition proceedings.

19           THE COURT:  How many documents are we talking about?

20           MS. LOUGHNANE:  I don't have an exact count because

21  the scope of documents that fall within her responsibilities

22  include her role as chief financial officer, which is at the

23  core of this case.  We have proposed to the Government

24  categories of documents that we thought would be a way to

25  compromise on what she would see.  That proposal was rejected.

*Rivka Teich CSR, RPR, RMR FCRR*
*Official Court Reporter*

STATUS CONFERENCE

1    I don't have an exact count for you.

2                THE COURT:  She's in Canada, do you envision going

3    to Canada and showing her these things?

4                MS. LOUGHNANE:  The proposal that was adopted in the

5    supplemental protective order permitted showing her either in

6    the presence of U.S. signatories to the protective order or on

7    an online platform that did not permit copying or downloading.

8                THE COURT:  It's a little unclear to me, is any of

9    this part of the sensitive materials?

10               MS. LOUGHNANE:  Some of the materials -- right now

11   the only thing she can only see are things she's copied on.

12   Some of the materials that are relevant that we would want to

13   ask her about that involve things she did or said for example,

14   they are not limited to that, but that's an easy example are

15   designated as SDM.  You'll remember that many of the SDM

16   concerns come from security concerns about taking things

17   outside of the country.  Here we're talking about Canada,

18   which is a place that the Government has already suggested is

19   an appropriate place to review SDM.  I don't think the

20   concerns about SDM are really what is at play here.

21               THE COURT:  The other question that I have is what

22   is the anticipated length of time that it's going to take to

23   resolve the extradition question?  I guess if you know the

24   answer to that, Mr. Kessler?

25               MR. KESSLER:  So, your Honor, I don't know the

*Rivka Teich CSR, RPR, RMR FCRR*
*Official Court Reporter*

STATUS CONFERENCE

1  answer to that question.  I can tell you my understanding of

2  the current schedule is that the committal hearing, which I

3  believe is kind of the final step in the initial process is

4  scheduled in May of 2021.  Then there would in theory other

5  steps and potential appeals.

6          I want to be careful about representing the time

7  frame in Canada, but I think the answer is probably a while,

8  if that's helpful.

9          And then I'm happy to address some of the other

10 questions, if that would be helpful.

11         THE COURT:  Well, why don't you tell me what your

12 response is to some of the things that Ms. Loughnane mentioned

13 and then I'll tell what you my thoughts are on this.

14         MR. KESSLER:  Sure.  So the first thing I'm a little

15 surprised about the answer about speaking with Ms. Meng.

16 First, because obviously there is nothing in the protective

17 orders that prevents the defendant from talking with her or

18 asking her virtually any question they have.  I'll get back to

19 that in a second.

20         Certainly there is no reason not to have

21 conversations with her or her counsel about whether and when

22 she'd be willing to talk to them.  This motion seems quite

23 premature.  It's not clear that she's willing to talk to them.

24         The second point is the request filed by the

25 defendant is to share every document in this case with her,

STATUS CONFERENCE

1    that's what they are asking in their reply brief.  They then

2    say they might be open to a reasonable compromise but the

3    current request is to share everything.

4           The third point is that protective order we

5    negotiated is a protective order we were comfortable with, in

6    part, because the documents are documents she has seen before.

7    We couldn't say the same terms would apply to other documents,

8    although there might be exceptions.  And the concern is even

9    if she doesn't have specific documents, she has information

10   that could be used in the fight against extradition.

11          So to clear up I think the question earlier, I don't

12   believe there has been a specific filing by Ms. Meng that says

13   she intends to use documents from this case.  What there have

14   been, and in fact I believe may even filed in the next day or

15   two, are motions that essentially attempt to have the trial of

16   this case in the extradition proceedings and to, it seems,

17   refer to documents that certainly sound very similar to

18   documents that are in the discovery in this case.  And we

19   certainly know that Huawei has given her some documents that

20   relate to the subject in this case.

21          So the final thing I want to say on this point, I do

22   want to come back to what the protective does and doesn't

23   allow.  I think that's an important thing to focus on.

24          The current protective order allows Huawei to talk

25   with her, talk with her about the answers in the Indictment,

STATUS CONFERENCE

1   about any public documents, about any internal documents,

2   about communications with victim institutions that Huawei has,

3   that were produced in discovery and they have already provided

4   her with some of those documents.  They are allowed to discuss

5   any internal Huawei documents about any of the other

6   allegations in the case about, for example, Huawei's ownership

7   of SkyCom.  They are allowed to discuss any internal documents

8   Huawei has about Huawei's financial operations.  They are

9   allowed to discuss any of her own communications.  They are

10  allowed to discuss any information provided to them by other

11  Huawei employees.  They are allowed to discuss whatever is in

12  the records of the case and the supplemental records of the

13  case that was submitted in Canada, which I don't remember

14  exactly how many pages they are, but they are not short.  And

15  then they are allowed to proceed to the answers in the reply

16  brief like explanations of relevant product negotiations and

17  solicitations under discussion between Ms. Meng's department

18  and bank representatives.  They are allowed to discuss that

19  topic with anyone else at the company.

20          Essentially there is a huge amount of information

21  that today the defense could be discussing with Ms. Meng, if

22  she were willing to talk with them.  Instead, what we're

23  talking about is a request to share all the discovery in this

24  case, which implicates some of the Government's concerns

25  instead of the defense preparing their defense using

25

STATUS CONFERENCE

1  everything I talked about and then potentially at a later

2  point seeing if there are specific exceptions we need to

3  address.

4          THE COURT:  I'll tell you -- I'm sorry, Ms.

5  Loughnane, did you want to say anything else in response to --

6  I think I understand everybody's position, is there anything

7  else you want to say?

8          MS. LOUGHNANE:  Yes, in part, because I think I

9  misunderstood your first question and I want to be clear.

10         We do understand that we can speak -- that Ms. Meng

11 would be willing to speak to the company.  I for some reason

12 understood you to be speaking particularly to some of the

13 issues in dispute under this order, but absolutely we

14 understand that Ms. Meng is willing to speak to the company.

15 So I want to eliminate that confusion.

16         Second, on the issue of sharing everything.  I think

17 we have been very clear with the Government, and I certainly

18 want to be clear with the Court, we're willing to talk about

19 reasonable categories with the Magistrate or whoever makes

20 sense, I think that's an easy issue to put to bed.

21         The broader things, first, it is important to think

22 about what is really the baseline here which is that of course

23 the defendants should be able to talk to witnesses, and of

24 course they have a right to prepare their defense.

25         Ms. Meng is really at the heart of this case.  And

STATUS CONFERENCE

1    the Government is seeking to hold Huawei responsible for

2    actions she took and things she said.  And she's the CFO in a

3    case that involves allegations of a financial fraud.  So she's

4    really a critical witness and the baseline is we should be

5    able to talk to her.

6          All of the things that Mr. Kessler just strung

7    together, an impressive list of things that we can talk to her

8    about, but I'm sure the Court noticed that most of those

9    things, there is no dispute.  It's a strong man that Huawei

10   could pull a document from its own documents and talk to her

11   about that.  But that's not really the issue here.

12         The issue is the discovery in this case that's

13   reflective of what the proof in this case will be and that's

14   what we need to speak to her about.  If there are documents

15   from a bank that say Ms. Meng did or said X, Y, Z, we need to

16   be able to ask her about that; and right now we can't.

17         That's the issue not whether Huawei can printout the

18   financial statements and speak to her, that's not the question

19   here.

20         THE COURT:  Anything else from you, Mr. Kessler?

21         MR. KESSLER:  I'll just say two things.  In terms of

22   the baseline here, this is not a baseline situation where the

23   co-defendant is fighting extradition and using the discovery.

24         The second thing I'll say, is the final category of

25   documents that Ms. Loughnane mentioned, which is the documents

STATUS CONFERENCE

1   that contain a statement by Ms. Meng is I believe specifically

2   the one additional small category of documents that we had

3   previously suggested we might be able to discuss with defense

4   counsel.

5          So essentially we're now arguing a motion to provide

6   her with all discovery, where the request actually seems to be

7   to provide her with a few statements that are her statements

8   but were not sent to or from her.

9          I think we should just -- there has hasn't been any

10  showing that Huawei's defense is prejudiced if they talk to

11  her today with all the information they have at their disposal

12  right now.

13         MS. LOUGHNANE:  If I could, Mr. Kessler's argument

14  just now is reflective of the problem.  It is true Ms. Meng is

15  fighting extradition, but the Huawei defendants are not.  They

16  are here.  They are not fugitives.  And they disentitled from

17  anything.  There is no authority, the Government hasn't

18  provided any and we're not aware of any, for punishing one

19  defendant for a co-defendant's decision to fight extradition.

20         THE COURT:  I'm going to ask -- sorry to interrupt.

21         It occur to me that this case is unusual in a lot of

22  ways, but one of the ways that it's unusual is that the head

23  of Huawei is the father of the co-defendant.  So I'm sure

24  there are some intertwined issues in the extradition matter.

25  Is that something that I should be permitted to consider?

*Rivka Teich CSR, RPR, RMR FCRR*
*Official Court Reporter*

STATUS CONFERENCE

1          MS. LOUGHNANE:  I'm not sure -- I don't know that

2     the personal relationship has any bearing here.

3          I think the question is Huawei has been charged in a

4     criminal case.  Huawei the entity it has a constitutional

5     right to defend itself.  It is the Government's burden to

6     demonstrate good cause to strip it of important components of

7     that right.  It is not Huawei's burden to show a need for the

8     visceral; that is clearly not what the law calls for.  It's

9     the Government's burden to show good cause.

10          And the co-defendant's decision to fight extradition

11     is not good cause for depriving Huawei of the ability to speak

12     to someone who is at the very heart of the matter.

13          It would be a different thing if the Government were

14     not seeking to hold Huawei responsible for Ms. Meng's actions,

15     but it is.  In that case, 18 months after the case is charged

16     the company really needs to speak to that core witness about

17     the matters in this case, not about sort of anything that's

18     ever happened in the company or --

19          THE COURT:  I think I understand.  I do want to

20     clarify, nobody is saying that you can't talk to her.  The

21     question is whether you can share all the discovery material,

22     which is right now what I understand the application to be.

23          That I am denying.  But I'm going to -- let me

24     finish -- what I'm going to do is direct the parties to see if

25     there are other categories of material that they can agree on

STATUS CONFERENCE

1    and then we'll see where we are.

2              But as far as today goes, this will change and it

3    could change, but I'm not permitting the wholesale sharing of

4    discovery under these circumstances.  I will certainly, it

5    happens every time we have one of these conferences that you

6    are working to resolve some of these issues, so that's what I

7    have to say about that.  I think we covered all of the topics,

8    unless there is something that someone is burning to say.

9              MR. SOLOMON:  I think there are minor bookkeeping

10   necessary to the CIPA.  We can schedule that and another

11   status conference with the exclusion of time.

12             THE COURT:  That I got.  I want to make sure there

13   is anything else on our list.  I did want to ask about

14   scheduling CIPA.

15             MR. SOLOMON:  The Government is prepared to schedule

16   a Section 2 conference, perhaps we can do that the same date

17   of the next status conference.

18             THE COURT:  What makes sense for the next conference

19   in terms of a date?  We have a lot of homework.

20             MR. SOLOMON:  It feels like we do have a homework,

21   once we've made progress with the homework perhaps in October

22   sometime.

23             THE COURT:  Does that make senses to you all,

24   Mr. Green, sometime in October?

25             MR. GREEN:  Yes, your Honor, I think that makes

*Rivka Teich CSR, RPR, RMR FCRR*
*Official Court Reporter*

STATUS CONFERENCE

1   sense.

2           THE COURT:  Okay.  Donna, can you pick up a mid

3   October day?

4           MR. SOLOMON:  October 13.

5           THE COURT:  Not a Friday, is it?

6           MR. SOLOMON:  It is a Tuesday.

7           THE COURT:  Let's do October 13, afternoon,

8   2:30 p.m.  When we get closer to the time I'm hopeful that

9   we'll be able to do some of these things in person, although

10  we don't have a plan yet.  I guess we'll address that when we

11  get closer to the time.

12          So the time is excludable in the interest of

13  justice.  I think I've already designated this as a complex

14  case, and I don't think we have anything else to discuss.

15          MR. GREEN:  I think that's correct, your Honor.

16          THE COURT:  Thank you everybody.  And I'll talk to

17  you in October and everybody stay healthy.  I also do want to

18  thank our court reporter.

19          (Whereupon, the matter was concluded.)

20                  *     *     *     *     *

21  I certify that the foregoing is a correct transcript from the
    record of proceedings in the above-entitled matter.

22

23

    Rivka Teich, CSR RPR RMR FCRR
24  Official Court Reporter
    Eastern District of New York

25

*Rivka Teich CSR, RPR, RMR FCRR*
*Official Court Reporter*